**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOSEPH O. BOGGI,** | : | |
| Plaintiff, | : | **CIVIL ACTION** |
| | : | |
| v. | : | |
| | : | |
| **MEDICAL REVIEW AND** | : | |
| **ACCREDITING COUNCIL, et al.,** | : | **No. 08-4941** |
| Defendants. | : | |

**MEMORANDUM**

Schiller, J.                                                          September 15, 2009

      Dr. Joseph O. Boggi, D.O., brings this action under 42 U.S.C. § 1983 and Title II of the

Americans with Disabilities Act ("ADA"). He seeks medical retraining from the Medical Review

and Accrediting Council ("MRAC") and alleges that state actors have attacked his property right –

his medical license. (Compl. at 2.)[1] Before the Court are three separate motions to dismiss filed by

various Defendants: (1) the motion of MRAC and Larry Downs; (2) the motion of Dr. Joseph

Sokolowski; and (3) the motion of the Institute for Physician Education ("IPE"), Drs. Andrea

Ciccone, Scott Manaker, Richard Hawkins, and Donald Melnick.[2] For the reasons that follow, the

motions are granted.

---

     [1] Dr. Boggi filed an Amended Complaint which the Court has considered along with his
original Complaint so as to broadly construe his factual allegations and claims.

     [2] According to IPE's motion to dismiss, IPE is a discontinued program of the National
Board of Medical Examiners ("NBME"), which is an "independent, not-for-profit organization"
that offers examinations for the health professions. (NBME Mem. of Law at 1-2.) The IPE is
not a legal entity but counsel for IPE accepted service of the Complaint on behalf of NBME and
asks this Court to substitute the NBME for IPE. (*Id*. at 2 n.2.) Dr. Boggi filed a motion to
amend his Complaint to add the NBME as a Defendant. This Court will allow the amendment
and substitute NBME for IPE in this action.

## I.   BACKGROUND[3]

As recounted by Dr. Boggi, in order to retrain doctors, states associate with organizations. MRAC evaluates and retrains doctors for New Jersey through the University of Medicine and Dentistry of New Jersey, a state institution.  (Compl. at 2.)  The IPE is an arm of the National Board of Medical Examiners responsible for developing tests and establishing standards for retraining doctors.  (Compl. at 2.)  Dr. Boggi tested in Philadelphia at the IPE and at MRAC.  (*Id*.) Specifically, Dr. Boggi contracted with MRAC for testing and retraining.  (Am. Compl. ¶ 1.)

### A.   Dr. Boggi's Medical Background

Dr. Boggi received his doctorate in osteopathy from the University of Osteopathic Medicine and Surgery in Des Moines, Iowa in 1983.  (MRAC Mot. to Dismiss Ex. B [Final Opinion & Order] at 3.)  He was a resident at the Walter Reed Army Medical Hospital from 1985 to 1988 and he received his certification in internal medicine in 1988.  (*Id*.)  He was initially licensed to practice medicine in Maryland in 1988.  (NBME Mot. to Dismiss Ex. 2 [Summary Suspension Order] at 1.)

Dr. Boggi was first diagnosed with Attention Deficit Disorder (ADD) in 1988 and took medication for the condition.  (Final Opinion & Order at 4.)  In October of 1992, Dr. Boggi was diagnosed with an Adjustment Disorder and Attention Deficit Hyperactivity Disorder ("ADHD"). (*Id*. at 5.)  He was honorably discharged from the Army in 1994, although based on an incident

---

[3] Although this litigation is currently at the pleading stage, both parties submitted a number of documents for the Court to review.  Dr. Boggi has filed what appears to be every piece of paper he has regarding his quest for retraining.  This is inappropriate.  With limited exceptions, the Court cannot consider the correspondence, taped conversations, and notes submitted on a motion to dismiss.  To provide a complete background of this litigation, the Court has recounted facts from sources outside of the Complaint and Amended Complaint.  However, the Court has accepted Dr. Boggi's well-pleaded factual allegations as true and liberally construed his pleadings.  Nonetheless, Dr. Boggi has failed to state a claim.

involving the military police, Dr. Boggi's privileges at the hospital where he was practicing were suspended and he received psychiatric evaluation and treatment. (*Id*. at 3-4.)

    **B.**    **Suspension of Dr. Boggi's License**

        *1.*    *Summary suspension*

On June 24, 1998, the Maryland State Board of Physician Quality Assurance (BPQA) summarily suspended Dr. Boggi's medical license. According to the written findings accompanying the summary suspension, the BPQA was required to take emergency action under Maryland law because it "received reliable information that questions the mental competency of [Boggi] to practice medicine; specifically, that [he] is displaying threatening, maladaptive behavior." (Summary Suspension Order at 1.) Additionally, the Summary Suspension Order recounts a number of interactions staff members of the BPQA had with Dr. Boggi as well as correspondence and phone calls containing "bizarre" content. (*Id*. at 5-7.) Dr. Boggi was examined by a psychiatrist who concluded that he "has demonstrated a pattern of behavior that physically threatens other people" and that he "lacks the ability to look at his behavior from another person's perspective and thereby does not learn from past experiences." (*Id*. at 7-8.) The psychiatrist, Dr. Ellen McDaniel, recommended that Dr. Boggi stop practicing medicine until he could control his behavior and that he undergo neuropsychological testing. (*Id*. at 8.) The BPQA determined that it had probable cause to believe that Dr. Boggi was "mentally incompetent to practice medicine, and that his continued practicing of medicine would jeopardize the health, safety and welfare of the citizens of Maryland." (*Id*. at 8.) Accordingly, Dr. Boggi's license was summarily suspended and a hearing was scheduled.

        *2.*    *Final Opinion and Order and Appeal*

Following an evidentiary hearing, an Administrative Law Judge ("ALJ") issued a proposed

decision in which she concluded that Dr. Boggi's condition rendered him mentally incompetent to practice medicine but did not recommend revocation of his license.  Instead, she suggested supervision of Dr. Boggi's treatment and monitoring of his practice.  Both the State and Dr. Boggi filed exceptions.  On April 28, 1999, Dr. Boggi and the State appeared before the BPQA for an oral hearing on the exceptions.  On September 22, 1999, the BPQA issued its Final Opinion and Order, which contained extensive factual findings detailing a number of incidents involving Dr. Boggi and largely adopted the findings of facts made by the ALJ.  Based on the evaluation conducted by Dr. McDaniel, the BPQA found that Dr. Boggi's ADHD resulted in numerous disruptive incidents causing co-workers and others to be intimidated by Dr. Boggi and fearful of him.  (Final Opinion & Order at 19.)  The BPQA found that Dr. Boggi "consistently displayed significant communication problems when dealing with people in a wide range of professional settings" which stemmed from his sense of entitlement and lack of empathy.  (*Id*. at 19-20.)  Dr. Boggi never physically injured a patient, staff member, or colleague but has "engaged in a physical confrontation, spoken abrasively, raised his voice inappropriately, destroyed property and caused others to have a justified fear of his presence.  (*Id*. at 20.)  His ADHD rendered him unable to control his behavior towards others and effectively communicate in a manner required to provide competent medical care.  (*Id*. at 20, 24.)  Furthermore, the ability to interact with and to effectively communicate with other medical personnel is an essential element of the competent practice of medicine.  (*Id*. at 24.)  The BPQA viewed Dr. Boggi's inability to competently practice medicine as a direct threat to the patient population.  (*Id*. at 20, 30.)

As a result, the BPQA suspended Dr. Boggi's license for one year and thereafter until Dr. Boggi obtained treatment that enabled him to safely and competently practice medicine.  (*Id*. at 34.)

4

The BPQA ordered Dr. Boggi to satisfy six conditions prior to having his license reinstated: (1) obtain neuropsychological testing and complete a personality inventory; (2) begin treatment with a BPQA-approved psychiatrist within thirty days of the Order suspending his license; (3) undergo at least one-year of treatment with said psychologist; (4) be re-evaluated by Dr. McDaniel after completing condition three; (5) appear before the BPQA's Case Resolution Conference to provide evidence that he is competent to safely practice medicine; and (6) provide evidence satisfactory to the BPQA that he has become competent to safely practice medicine.  (*Id*. at 34.)

On December 13, 2001, the Maryland Court of Special Appeals affirmed the suspension of Dr. Boggi's medical license.  (NBME Mot. to Dismiss Ex. 4 [Md. Appeals Decision].)  The court considered, *inter alia*, Dr. Boggi's objection that the BPQA failed to correctly apply the ADA.  The court concluded that Dr. Boggi failed to make a showing that he could perform the essential functions of his job with reasonable accommodation.  (Md. Appeals Decision at 35-36.)  Further, the court found that Dr. Boggi was not a "qualified individual" under the ADA because the BPQA established substantial evidence that Dr. Boggi's continued practice of medicine posed a direct threat to the health or safety of others due to his disability that reasonable accommodation could not eliminate.  (*Id*. at 36-38.)  Ultimately, the court affirmed the Final Opinion and Order of the BPQA.

### C.    Dr. Boggi's MRAC testing

Dr. Boggi first contacted MRAC in November of 2005 and was eventually tested over two days in May of 2006.  (Compl. at 11.)  Dr. Manaker was the independent contractor for the IPE who, on those days, tested and evaluated Dr. Boggi's ability to practice medicine.  (NBME Mem. of Law at 10.)  Although Dr. Boggi did not formally complain about the first day of testing, he verbally, and later in writing, objected that two of three tests on the first day were "60 questions per minute," a fact

5

that he was not informed of prior to testing.  (Compl. at 11.)  However, Dr. Boggi stated that "I do not worry about that so much, since, despite my ADHD, I can go that fast."  (*Id*.)  Dr. Boggi's also complained about the topics on the exam and the manner in which the test was scored.  (*Id*. at 11-12.)

Regarding the second day of testing, Dr. Boggi contends that "I know that I did well on the second day of testing, but it was even more bizarre, and so I complained about that set of testing verbally many times that day."  (Compl. at 12.)  Among Dr. Boggi's complaints was that the computer used during the simulated patient care cases was exceedingly slow, although he continued with the test because "everyone has to use the same one."  (Compl. at 12.)  Nonetheless, Dr. Boggi was unaccustomed to using such slow machinery and the "speed of the computer changes the nature of the test tremendously."  (*Id*.)  Dr. Boggi also noted that the IPE staff complained to him about his computer skills.  (*Id*. at 13.)  He further claims that Defendants failed to disclose the proper study materials for the test.  (Am. Compl. ¶ 20.)

Dr. Boggi also expressed concerns about the interview portion of his exam, which he described as "an ambush interview."  (Compl. at 14.)  He contends that he was "yelled at, scolded, derided for not knowing any medicine, and generally abused."  (*Id*.)  He claims surprise that the examiner charged that Dr. Boggi displayed "disordered thinking" which disqualified him from re-training.  (*Id*. at 15.)  According to Dr. Boggi, he was asked to recall three hours of data in order, three hours after the fact and to describe the various patient cases he was given in the morning, including what he did and what he was thinking when he did it.  (*Id*. at 14-15.)  Dr. Boggi performed well on this memory test, and the examiner's report even noted that he took good care of all of the patients.  (*Id*. at 15.)

Unhappy with the testing, Dr. Boggi asked to be retested on the interview and requested that the retest be monitored.  (*Id*.)  His request was denied.  (*Id*. at 16; Am. Compl. ¶ 31.)

On July 17, 2006, MRAC provided Dr. Boggi with the results of his evaluation.  (Testing Results.)  Based on the result of the test, Dr. Boggi performed acceptably on the multiple choice portion of the exam.  With respect to the eight-case computer simulation, "Dr. Boggi concluded the correct diagnosis for all 8 of the 8 cases during the simulation."  (NBME Mot. to Dismiss Ex. 5 [Testing Results] at 1.)  Indeed, he scored above the mean for six of the eight cases.  (*Id*.)  During the Transaction Stimulated Recall (TSR) Interview portion of the exam, however, Dr. Manaker observed that although Dr. Boggi recalled most of the details of the eight cases, his discussion of the cases was marked by an "inability to maintain a logical and orderly train of thought, his frequent digressions from a specific question or topic, and his frequent assertions regarding his knowledge, experience, and clinical competence."  (*Id*. at 1-2.)  None of the patients involved in the simulations were offered dangerous, improper or even inappropriate testing or therapy.  (*Id*. at 3.)  Nonetheless, his inability to discuss certain types of therapy could lead to increased risks for patients.  (*Id*. at 4.)  In summary, "Dr. Boggi demonstrated basic medical knowledge that was adequate, but limited in scope and dated in currency."  (*Id*. at 4.)  He also struggled to describe and articulate his rationale in making clinical decisions.  (*Id*.)

After he received notice of his results, Dr. Boggi requested that MRAC develop a remedial program to address the deficiencies he displayed in the competency evaluation.  (Compl. Ex. 1 [Oct. 16, 2006 Letter from Downs to Dr. Boggi].)  After reviewing his case, MRAC concluded that it lacked the capacity to engage in remediation for him based on his disordered thinking.  (*Id*.)  His underlying dual problems of ADHD and narcissistic personality disorder presented a "real problem"

for any possible MRAC remediation plan. (*Id*.)  MRAC closed his file. (*Id*.)

Dr. Boggi seeks injunctive relief, namely a Court order requiring that Dr. Boggi be retrained in medicine. (Compl. at 16.)  He also seeks compensatory and punitive damages. (*Id*. at 17; Am. Compl. ¶¶ 12-13, 22, 38, 43, 47.)

## II.     STANDARD OF REVIEW

In reviewing a motion to dismiss for failure to state a claim, a district court must accept as true all well-pleaded allegations and draw all reasonable inferences in favor of the non-moving party. *See Bd. of Trs. of Bricklayers and Allied Craftsman Local 6 of N.J. Welfare Fund v. Wettlin Assocs.*, 237 F.3d 270, 272 (3d Cir. 2001).  A court should accept the complaint's allegations as true, read those allegations in the light most favorable to the plaintiff, and determine whether a reasonable reading indicates that relief may be warranted. *Umland v. PLANCO Fin. Servs.*, 542 F.3d 59, 64 (3d Cir. 2008).  Dr. Boggi is proceeding pro se, so this Court must construe his Complaint liberally and apply the applicable law, even if he failed to mention it by name. *See Alston v. Parker*, 363 F.3d 229, 234 (3d Cir. 2004); *Dluhos v. Strasberg*, 321 F.3d 365, 369 (3d Cir. 2003).  A court need not credit "bald assertions" or "legal conclusions" when deciding a motion to dismiss. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

"Factual allegations [in a complaint] must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  To survive a motion to dismiss, a complaint must include "enough facts to state a claim to relief that is plausible on its face." *Id*. at 570.  Although the federal rules impose no probability requirement at the pleading

stage, a plaintiff must present "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element[s]" of a cause of action. *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. Simply reciting the elements will not suffice. *Id*. (concluding that pleading that offers labels and conclusions without further factual enhancement will not survive motion to dismiss); *see also Philips*, 515 F.3d at 231.

The Third Circuit Court of Appeals has recently directed district courts to conduct a two-part analysis when faced with a 12(b)(6) motion. First, the legal elements and factual allegations of the claim should be separated, with the well-pleaded facts accepted as true but the legal conclusions disregarded. *Fowler v. UPMC Shadyside, Inc.*, App. A. No. 07-4285, – F.3d –, 2009 WL 2501662, at *5 (3d Cir. Aug. 18, 2009). Second, the court must then make a common sense determination of whether the facts alleged in the complaint are sufficient to show a plausible claim for relief. *Id*. If the court can only infer the mere possibility of misconduct, the complaint must be dismissed because it has alleged – but has failed to show – that the pleader is entitled to relief. *Id*.

When faced with a motion to dismiss for failure to state a claim, courts may consider the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim. *Lum v. Bank of Am.*, 361 F.3d 217, 222 n.3 (3d Cir. 2004). A district court may also consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document. *Pension Ben. Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

III.     **DISCUSSION**

A.     **Section 1983**

All moving Defendants have argued in their motions that Dr. Boggi's § 1983 claims must be dismissed because none of their actions were performed under color of state law.  Section 1983 does not create substantive rights but rather provides remedies for the deprivation of rights established by the Constitution or federal laws.  *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006).  To establish a claim under § 1983, the plaintiff must show that the defendant, acting under color of state law, deprived him or her of a right secured by the Constitution or the laws of the United States.  *Id*.

A private party may be the appropriate subject of a § 1983 action under certain circumstances.  The Supreme Court has created a number of tests to determine whether a private actor has performed an act under color of state law.  For example, the "close nexus" test determines if the state can be deemed responsible for the specific conduct of which the plaintiff complains. *Jackson v. Metro. Edison Co.*, 419 U.S. 345 (1974).  The "symbiotic relationship" or "joint participation" test asks if the state has "insinuated itself into a position of interdependence with [the acting party]" sufficiently to be recognized as a joint participant in the challenged activity.  *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961).  The "public function" test looks at whether the private party is engaged in activities traditionally left to the state.  *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982); *see also McKeesport Hosp. v. The Accreditation Council for Graduate Med. Educ.*, 24 F.3d 519, 524 (3d Cir. 1994) (noting that state action may be found if private party has been delegated power normally reserved to the state) (citing *Flagg Bros. v. Brooks*, 436 U.S. 149,

157 (1978)).[4]  The state actor inquiry is fact intensive, and multiple tests may apply to a given case;

in fact, the tests may overlap.  *Goussis v. Kimball*, 813 F. Supp. 352, 357 (E.D. Pa. 1993).  The Third

Circuit Court of Appeals has described the color of state law analysis as "difficult" but has reminded

district courts that it is grounded in a "basic and clear requirement that the defendant in a § 1983

action have exercised power possessed by virtue of state law and made possible only because the

wrongdoer is clothed with the authority of state law." *Groman v. Twp. of Manalapan*, 47 F.3d 628,

638 (3d Cir. 1995) (internal quotations omitted).  Thus, for private action to be deemed state action,

the act must be fairly attributed to the state itself.  *Id*. (citing *Jackson*, 419 U.S. at 351.).  Plaintiff

bears the burden of proof on the issue of acting under color of state law.  *Groman*, 47 F.3d at 638.

      1.    *Close nexus test*

      Under this test, the state must have exercised coercive power or have provided such

significant encouragement that the private actor's decision can be deemed that of the state.  *Blum v.*

*Yaretsky*, 457 U.S. 991, 1004 (1982).  This test looks at the connection between the state and the

specific action that allegedly infringed on the plaintiff's rights, in contrast to the symbiotic

relationship test which focuses on the entire relationship between the state and the private actor.

*Klavan v. Crozer-Chester Med. Ctr.*, 60 F. Supp. 2d 436, 442 (E.D. Pa. 1999).  This test is met only

if it can be said that the state is responsible for the specific conduct about which the plaintiff

complains.  *Id*. (citing *Blum*, 457 U.S. at 1004.)

      According to the letter that Dr. Boggi included with his Complaint, MRAC reviewed his case

---

[4] In a recent opinion from this District, the court references a fourth test: the "joint action" test, which applies if a private party is a "willful participant in joint action with the State or its agents."  *See Pugh v. Chester Downs and Marina, LLC,* Civ. A. No. 09-1572, 2009 WL 2251658, at *3 n.4 (E.D. Pa. July 27, 2009) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982)).

and determined that it could not offer him further services.  MRAC's decision was made by private parties and in no way involved the State of Maryland.  The decision was made according to standards established by MRAC, not by Maryland.  MRAC is a private organization that merely offers testing and retraining services to assist doctors in getting their medical licenses back.  The BPQA, on the other hand, was the state actor that suspended Dr. Boggi's license and placed conditions on his ability to have his license reinstated.  But there is no connection between the BPQA and MRAC.  Under such circumstances, a "close nexus" cannot be said to exist between MRAC and the State of Maryland.  *See Imperiale v. Hahnemann Univ.*, 776 F. Supp. 189, 199 (E.D. Pa. 1991) (holding that ultimate decision by hospital to revoke medical degree was not state action under close nexus test).  The same can be said of NBME, which facilitates testing for medical professionals.  There is no indication that the State of Maryland, or any other state, holds sway over the policies or procedures of NBME nor is there any evidence that Maryland plays any role in devising questions or medical tests for those seeking to become doctors.

> 2.    *Symbiotic relationship test*

If a "symbiotic relationship" exists between the private party and the state, the private party's conduct may be held attributable to the state.  *See Reitz v. County of Bucks*, 125 F.3d 139, 147-48 (3d Cir. 1997) ("[I]f the facts support a finding that the private parties acted as a 'joint participant' in the challenged activity with the state, then they can be found to have acted under color of state law and to be liable under § 1983.").  Courts have held that this test is not satisfied – and thus the actions of a private institution cannot be attributed to the state – even upon a showing of state regulation in a particular area, even if such regulation is "pervasive, extensive, and detailed," nor is it satisfied due to extensive financial assistance.  *Klavan*, 60 F. Supp. 2d at 442 (citations omitted).

Dr. Boggi explicitly references the "symbiotic relationship" between the state, NBME, and MRAC. (Compl. at 3.)  He contends that MRAC would not exist but for the state's need to have an institute to retrain doctors.  (*Id.*)  He also relies on the fact that MRAC affirmed the findings of Maryland.  (*Id.*)  The Court concludes that no basis exists for finding a symbiotic relationship between the State of Maryland and Defendants.  Maryland is under no duty to use MRAC or NBME. There is no evidence of any financial relationship or any legislative powers that Maryland maintains over these entities.  At most, NBME and MRAC are companies with which certain states deal in the realm of medical licensing.  But that interaction does not render them state actors.

> 3.   *Public Function test*

This approach reaches "only those activities that have been traditionally the *exclusive* prerogative of the State."  *Groman*, 47 F.3d at 640.  Because few functions have traditionally been the sole domain of the states, this test is rarely satisfied.  *See Pugh*, 2009 WL 2251658, at *3 n.4 (E.D. Pa. July 27, 2009) (quoting *Flagg Bros.*, 436 U.S. at 158 ("While many functions have been traditionally performed by governments, very few have been 'exclusively reserved to the State.'")).

Neither NBME nor MRAC is performing an activity left solely to the state.  Testing and test score reporting are not tasks left solely to the state.  *See Metzger v. Nat'l Comm'n of Certification of Physician Assistants*, Civ. A. No. 00-4823, 2001 WL 76331, at *3 (E.D. Pa. Jan. 26, 2001); *see also Johnson v. Educ. Testing Serv.*, 754 F.2d 20, 25 (1st Cir. 1985) ("[T]he formulation, grading, and reporting of standardized tests is not an exclusive public function.").  More broadly, the Third Circuit Court of Appeals has concluded that "[t]he evaluation and accreditation of medical education in this country is neither a traditional nor an exclusive state function."  *McKeesport*, 24 F.3d at 525. Neither entity is empowered to license physicians, a task left to the State of Maryland.  *See* MD.

CODE ANN., [HEALTH OCC.] § 14-201, *et seq.* (2009) (establishing State Board of Physicians and setting forth duty of Board, including power to issue, suspend, and reinstate licenses). Furthermore, Dr. Boggi's Complaint states that "no state in the union retrains doctors on their own," an acknowledgment that retraining is not a task left solely to the states. (*See* Compl. at 2.)

### 4.    Additional state actor analysis

Dr. Boggi's Complaint is short on factual allegations that would render any of the moving Defendants state actors. Furthermore, his conclusory assertions that they are state actors is a matter of law for the Court. His Complaint asserts that Defendant IPE is "an arm of the National Board of Medical Examiners" which writes tests and establishes standards. (Compl. at 2.) IPE is associated with several centers around the country who perform the testing and retraining of doctors. (*Id.*) Defendant MRAC is one such center. (*Id.*) A review of cases containing allegations similar to those made by Dr. Boggi demonstrates that Defendants are not state actors for § 1983 purposes.

In *Metzger v. National Commission on Certification of Physician Assistants*, the court considered whether the defendant, which had required the plaintiff to take a recertification examination and notified her after she failed the exam that her certification would expire, was a state actor. The court concluded that the defendant, which simply provided a mechanism by which a candidate for recertification could meet requirements set by Pennsylvania, was not a state actor. *Metzger*, 2001 WL 76331, at *2. The court considered the three tests outlined by the Supreme Court and determined that based on the facts of the case, the defendant did not perform an act traditionally relegated to the states, was not under the control of the state, nor was there a "symbiotic relationship" because the Commonwealth relied on the defendant's test results. *Id.* at 3. A similar result was reached in *Sammons v. National Commission on Certification of Physician Assistants, Inc.*, 104 F.

Supp. 2d 1379 (N.D. Ga. 2000) (*relying in part on Gilliam v. Nat'l Comm'n for Certification of Physician Assistants, Inc.*, 727 F. Supp. 1512 (E.D. Pa. 1989). The defendant was a private non-profit corporation that administered a nationwide testing and certification program for physician assistants. The plaintiff, a foreign physician, was told that she was ineligible for certification because she failed to meet the defendant's threshold requirements. The court determined that the defendant did not act under color of state law because it was a private organization that received no governmental financial support and operated on an independent basis. *Sammons*, 104 F. Supp. 2d at 1382-83. The court rejected the argument that the defendant was a state actor under the "public function" test and found that the defendant could not meet the "close nexus" test because the defendant was an autonomous body that evaluated students without external states influence.

Similarly, a district court in Illinois has considered whether NBME is a state actor. *Brown v. Fed'n of State Med. Bds. of the U.S.*, Civ. A. No. 82-7398, 1985 WL 1659 (N.D. Ill. May 31, 1985). The plaintiff in *Brown* had received his medical degree from a foreign institution but had taken and failed his licensing exam, although he asserted that he had actually passed the exam. He sought to personally review his test booklet and answer sheet. Acting *pro se*, he claimed, *inter alia*, that his civil rights had been violated by three defendants: (1) the Federation of State Medical Boards of the United States, a non-profit corporation identified as the certifying examiner responsible for selecting questions for licensing tests; (2) the Educational Commission for Foreign Medical Graduates, Inc. ("Commission"), a non-profit corporation responsible for certifying foreign medical graduates and also selecting questions for tests it administered and sent to NBME for scoring; and (3) the NBME, which prepared the tests, sent them to various state boards to be administered, and scored them. The Commission determined what qualified as a passing score and certified those who

15

passed the test.  Some state boards required certification for foreign medical students before they could receive a license, although none of the defendants were responsible for licensing physicians.

The court concluded that none of the defendants were state actors and therefore dismissed the complaint.  *Id*. at *5.  The defendants merely supplied a service but the actual state actors were the state licensing boards, which maintained control over whether to use and if so how to use the test. *Id*.  Supplying testing services did not make the defendants state actors.  *Id*.; *see also Johnson*, 754 F.2d at 24 (holding that the defendant non-profit corporation that prepared and administered law school admission test was not a state actor as it lacked authority to make admission decisions).

Plaintiff's Complaint contains no allegation that NBME does anything other than write the test and establish standards.  This is consistent with NBME's description of its role as an independent, non-profit company that provides tests for health professions.  NBME performs tests and evaluates doctors.  It does not license physicians and has no power over any state with respect to who may or may not practice medicine in a given jurisdiction.  Simply because states may choose to rely on NBME's evaluation does not render them state actors.  Similarly, MRAC merely offers retraining services to doctors so that they may re-apply for admission or re-admission to a state medical board.  MRAC plays no role in the ultimate decision to admit Dr. Boggi nor does it appear that its services are required prior to re-admission.

In *McKeesport Hospital v. The Accreditation Council for Graduate Medical Education*, the court considered whether a private accrediting body's decision constituted state action.  The case involved a hospital's challenge to the decision of a private unincorporated association to recommend withdrawal of the hospital's residency program's accreditation.  The Third Circuit concluded that the defendant was not a state actor.  *Id*. at 524.  First, no state officials participated in the decision

and therefore the hospital failed to show "overt, significant assistance" as required.  *Id.* (quoting *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 622 (1991)).  Furthermore, the defendants were not ultimately responsible for approving medical training facilities in the Commonwealth and thus the private actor was not exercising a power traditionally left to the state.  *Id.* at 524-25.  The court also rejected the contention that the defendant and the state were so interdependent that a "symbiotic relationship" existed given the fact that the state board merely recognized and relied upon the expertise of the defendant.  *Id.* at 525.

Dr. Boggi has presented nothing that would lead this Court to stray from the decisions of these cases.  The State of Maryland, through the Board, is responsible for licensing doctors.  Dr. Boggi cannot file a civil rights lawsuit seeking to reinstate his license against those not involved in the decision-making process regarding his ability to practice medicine.  None of his allegations gives rise to an inference that Maryland acted with Defendants, controlled Defendants, instructed Defendants, or were even aware of Defendants interactions with Dr. Boggi.  The actions of NBME and MRAC are not attributable to Maryland and thus neither Defendant, nor any of the persons working for either Defendant, can de deemed a state actor.

### B.    Claims Against Individual Actors

The caption also names Larry Downs, Esquire; Drs. Manaker, Hawkins, Melnick, and Sokolowski; and Andrea Ciccone.  The Complaint however, contains no further mention of these individuals.  The Amended Complaint is no more helpful as it states only that he consulted with all Defendants about his testing and retraining.  (Am. Compl. ¶ 8.)  Ciccone is an Assistant Vice President, Post Licensure Assessment System at NBME; Dr. Melnick is the President of the Post Licensure Assessment System at NBME; Dr. Hawkins is a former NBME Vice President,

17

Assessment Programs; and Dr. Manaker is an independent consultant to NBME who conducted the clinical interview of Dr. Boggi.  (NBME Mem. at 2; Am. Compl. ¶ 24.)  Downs' appears to be MRAC's President and Dr. Sokolowski's position is unclear.  Dr. Boggi's Complaint contains no basis for holding any of these individuals liable.  With the exception of Dr. Manaker, who interviewed Dr. Boggi, his interactions with these individuals is unclear and does not support a claim.  All of these individuals are dismissed from this action.

C.     **Americans with Disabilities Act Claim**

Dr. Boggi's ADA claim is brought under Title II, which provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  A public entity includes:  state and local governments; "any department, agency, special purpose district, or other instrumentality of a State or States or local government;" and the National Railroad Passenger Corporation and any commuter authority.  42 U.S.C. § 12131.  Neither MRAC nor NBME falls within the definition of a public entity under Title II of the ADA and the claims must therefore be dismissed.

But because Dr. Boggi is acting *pro se*, this Court will also determine whether he states a claim under another section of the ADA.  Under Title III of the ADA,

> Any person that offers examinations or courses related to applications, licensing, certification, or credentialing for secondary or post-secondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals.

42 U.S.C. § 12189.  Neither NBME nor MRAC argue that they fall outside the scope of the ADA and the law is clear that both entities must comply.  *See Love v. Law Sch. Admissions Council, Inc.*,

513 F. Supp. 2d 206, 223 (E.D. Pa. 2007) (finding that private, non-profit entity responsible for administering test required for admission to law school had to comply with ADA); *see also Scheibe v. Nat'l Bd. of Med. Examiners*, Civ. A. No. 05-180, 2005 WL 1114497, at *3 (W.D. Wis. May 10, 2005) (citing cases concluding that NBME is subject to ADA); *Biank v. Nat'l Bd. of Med. Examiners*, 130 F. Supp. 2d 986, 988 (N.D. Ill. 2000) (holding that NBME, "as a private entity offering examinations related to licensing, is subject to ADA under Section 12189").

Although NBME and MRAC must comply with the ADA, Dr. Boggi's claim remains legally deficient because it lacks any allegations that Defendants discriminated against him because of his disability.[5]  His original Complaint objects to the number of questions he was required to complete in a given amount of time.  However, the Complaint explicitly states that despite his ADHD, he "can go that fast." (Compl. at 11.)  His other problems with the testing involved the slow speed of the computer provided, the subjects on the test, and the method of scoring the test.  (*Id.* at 11-13.)  Of course, none of these complaints in any way relate to his disability.  His Amended Complaint does not expound upon his ADA claim, although he does assert that he is disabled under the ADA and that he had been discriminated against on the basis of his disability.  But this is a legal conclusion for which he provides no factual support.  Furthermore, Dr. Boggi's Amended Complaint makes explicit that Dr. Boggi "do[es] not need an accommodation, [and] never asked for an accommodation." (Am. Compl. ¶ 46.)  Dr. Boggi cannot state a claim simply by asserting that he

---

[5] Defendant Dr. Sokolowski claims that Dr. Boggi's ADA claim should be dismissed because he has failed to allege that he falls within the definition of disabled under the ADA, namely that he pled no facts sufficient to show that his ADHD substantially limits one or more major life activities.  (Sokolowski Mem. of Law in Supp. of Mot. to Dismiss at 14-15.)  While the Court finds Dr. Boggi's allegations to be lacking with respect to this issue, his Complaint fails even accepting that he meets the definition of disabled under the ADA.

has ADHD coupled with his inability to receive the retraining he seeks.  The record contains no factual allegations from which one can conclude that NBME had any interactions with Dr. Boggi let alone did anything that violated the ADA; similarly there are no factual allegations from which one can infer that MRAC's decisions were based on any perceived disability from which Dr. Boggi suffered.  The ADA claims against NBME and MRAC must therefore be dismissed.

The ADA claims against individual Defendants must also be dismissed.  Although not directly addressed by the Supreme Court or the Third Circuit Court of Appeals, the overwhelming authority on the issue has concluded that no such individual liability exists.  *See Koslow v. Pennsylvania*, 302 F.3d 161, 178 (3d Cir. 2002) ("[T]here appears to be no individual liability for damages under Title I of the ADA.");  *see also McQuaid v. ACTS Retirement Communities Southhampton Estates*, Civ. A. No. 04-3620, 2005 WL 2989642, at *2 (E.D. Pa. Aug. 8, 2005) (citing cases in this District and from other circuits holding that individual liability under ADA does not exist); *McInerney v. Moyer Lumber & Hardware, Inc.*, 244 F. Supp. 2d 393, 398 (E.D. Pa. 2002). Individual liability under the ADA does not exist under Titles II or III of the ADA.  *Emerson v. Thiel Coll.*, 296 F.3d 184, 189 (3d Cir. 2002) (finding individuals not liable under Title III of ADA "comports with decisions of other courts of appeals holding that individuals are not liable under Titles I and II of the ADA").

## IV.    CONCLUSION

Dr. Boggi has not alleged facts sufficient to support the legal conclusion that NBME and MRAC are state actors and his § 1983 claim against all Defendants must be dismissed.  His ADA claims also fail to state a claim.  An appropriate Order will be docketed separately.